# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| RICHARD F. BURKHART, WILLIAM E. KELLY, RICHARD S. LAVERY, THOMAS R. PRATT, and GERALD GREEN, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>GENWORTH FINANCIAL, INC., GENWORTH HOLDINGS, INC., GENWORTH NORTH AMERICA CORPORATION, GENWORTH FINANCIAL INTERNATIONAL HOLDINGS, LLC, and GENWORTH LIFE INSURANCE COMPANY,<br><br>Defendants. | C.A. No. 2018-0691-NAC |

## MEMORANDUM OPINION

Date Submitted: June 18, 2024
Date Decided: August 21, 2024

Peter B. Andrews, Craig J. Springer, David M. Sborz, ANDREWS & SPRINGER LLC, Wilmington, Delaware; Edward F. Haber, Michelle H. Blauner, Ian J. McLoughlin, Patrick J. Vallely, SHAPIRO HABER & URMY LLP, Boston, Massachusetts; *Counsel for Plaintiffs Richard R. Burkhart, William E. Kelly, Richard S. Lavery, Thomas R. Pratt, and Gerald Green.*

Srinivas M. Raju, Elizabeth J. Freud, Daniel A. Dreisbach, Susan Hannigan Cohen, Kevin M. Gallagher, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Reid L. Ashinoff, Kenneth J. Pfaehler, T. Carter White, DENTONS US LLP, New York, New York; John C. Hueston, Marshall A. Camp, Padraic Foran, Zachary Murray, HUESTON HENNIGAN LLP, Los Angeles, California; *Counsel for the Defendants Genworth Financial Inc., Genworth Holdings, Inc., Genworth North America Corporation, Genworth Financial International Holdings, LLC, and Genworth Life Insurance Company.*

**COOK, V.C.**

This decision resolves the defendants' motion to compel (the "Motion") as it relates to the production of two categories of documents: (1) a litigation funding agreement and (2) unredacted fee agreements. The plaintiffs' arguments as to the latter are wholly dependent on the success of their arguments as to the former.

As to the former, the plaintiffs raise two objections to the production of the funding agreement—relevance and the work product doctrine. Delaware state courts have addressed the production of litigation funding agreements and related communications on several occasions. Three decisions have required production of the funding agreements but permitted limited redactions on work product grounds. But this Court's most recent decision to address the issue seems to have rejected the general applicability of the work product doctrine to litigation funding agreements. And in another decision, this Court ordered production of litigation funding communications, notwithstanding objections on work product grounds. None of these cases, however, arise in the class action context.

As explained below, I find the litigation funding agreement relevant for two reasons. First, the class action context and specific aspects of this litigation give rise to several unique concerns, including the potential for class counsel to face conflicts of interest and for the third-party funders to exercise improper control over the litigation. These concerns may foreseeably bear on my decision as to the pending motion for class certification. Second, the parties to the litigation funding agreement set forth their collective "expectation" that the agreement would be disclosed to the Court during litigation in advance of class certification. I read this "expectation" as

an acknowledgment of relevance. I conclude further that the plaintiffs' three-sentence argument as to work product does not satisfy their burden of showing the funding agreement may be withheld on that basis. Accordingly, I grant the Motion as to the funding agreement. And the plaintiffs' only argument as to the fee agreements rises and falls with their arguments as to the funding agreement.

## I.    BACKGROUND

In March 2023, the defendants Genworth Financial, Inc., Genworth Holdings, Inc., Genworth North America Corp., Genworth Financial International Holdings, LLC, and Genworth Life Insurance Co. (together, "Defendants") served requests for production on the named plaintiffs.[1] The named plaintiffs are Richard F. Burkhart, William E. Kelly, Richard S. Lavery, Thomas R. Pratt, and Gerald Green (together, "Plaintiffs"). In their requests for production, Defendants sought production of the fee agreements between class counsel and Plaintiffs (the "Contingent Fee Agreements"). Plaintiffs produced the Contingent Fee Agreements in August 2023, but they did so with heavy redactions to the part of the agreement discussing the actual fee arrangement between Plaintiffs and putative class counsel (the law firm of Shapiro Haber & Urmy LLP or "SHU"). The redactions were so extensive that, under

---

[1] *Burkhart v. Genworth Fin. Inc.*, C.A. No. 2018-0691-NAC ("Dkt.") 318, Pls.' Opp'n to Defs.' Mot. to Compel ("Pls.' AB") Ex. 1.

2

the heading "LEGAL FEES AND EXPENSES[,]" only a single sentence is unredacted.[2]

Defendants deposed Plaintiffs between August and November of 2023. Only after these depositions does it seem that Plaintiffs revealed the existence of a litigation funding agreement (the "Funding Agreement") with certain unidentified "Litigation Funders" (the "Funders").[3] To date, Plaintiffs have refused to produce any copy of the Funding Agreement or to disclose even the Funders' identities.

Plaintiffs moved for class certification on January 12, 2024. In their motion papers, they argue "[t]here are no conflicts between the named Plaintiffs and the members of the Class[,]"[4] and they and their counsel satisfy all the respective factors for appointment as class representatives and class counsel.[5] On March 20, 2024, two days before Plaintiffs were due to file their reply brief in support of their motion for class certification, Plaintiffs produced a new version of the Contingent Fee Agreements—this time, with fewer redactions. In the most recent iteration, the legal fees and expenses section describes part of the Funding Agreement (the "Funding Agreement Description"). It provides the following:

> [REDACTED] have agreed to pay the reasonable legal fees and expenses
> of the Firm and its local Delaware local [*sic*] counsel in prosecuting the

---

[2] Dkt. 310, Aff. of T. Carter White in Supp. of Defs.' Mot. to Compel ("White Aff.") Exs. 1–5.

[3] White Aff. Ex. 6 at 2.

[4] Dkt. 291, Opening Br. in Support of Pls.' Mot. for Class Certification at 42.

[5] *Id.* at 40–57; *see also id.* at 6 (asserting "[P]laintiffs should be appointed as class representatives" and "[SHU] should be appointed as Class Counsel").

3

Class Action, up to a total amount of [REDACTED] plus the reasonable fees and expenses of any experts whom SHU may reasonably retain to assist it in the prosecution of the Class Action. The [REDACTED] understand and have agreed in writing that notwithstanding such payments, they will have no right to exercise any control over either the manner in which the Class Action is prosected or any negotiations that may subsequently occur in an attempt to settle the Class Action. To the contrary, the [REDACTED] have agreed that only you and any other class representatives who may be appointed by the Court will have the right to direct the actions of SHU and its local counsel with respect to the manner in which the Class Action is prosecuted or resolved.[6]

To date, Plaintiffs refuse to produce the Contingent Fee Agreement without redactions. Less than one month after Plaintiffs produced the second version of the Contingent Fee Agreement, Defendants filed the Motion. They seek to compel production of (1) the Funding Agreement and (2) the unredacted Contingent Fee Agreements.[7]

I heard oral argument on the Motion on June 13, 2024. After oral argument, I ordered Plaintiffs' counsel to submit the withheld documents for *in camera* review.

## II.     LEGAL ANALYSIS

Court of Chancery Rule 26(b)(1) permits discovery "'regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case.' When a party . . . withholds discovery on the ground of

---

[6] White Aff. Exs. 7–11.

[7] Defendants also seek to compel production of documents and further deposition testimony surrounding two other categories. I defer ruling on those other categories, pending further briefing. I will issue a letter concerning supplemental briefing separately.

privilege, that party bears the burden 'of establishing each of [the applicable privilege's] elements.'"[8]

Defendants seek production of the entire Funding Agreement. They argue that the presence of litigation funders creates the potential for conflicts of interest that may incentivize counsel to prioritize the interests of the Funders over those of the class. And the potential for such conflicts makes the Funders' identity and the character of its interest in the litigation relevant and necessary to test whether Plaintiffs are "truly independent from the [F]under[s'] direction and control . . . ."[9] Plaintiffs counter with two arguments—relevance and the work product doctrine.

## A.  Relevance

"Information sought in discovery is considered relevant 'if there is any possibility that the information sought may be relevant to the subject matter of the action.'"[10]

> [T]he requirement of relevancy must be construed liberally. . . . [T]he spirit of Rule 26(b) calls for all relevant information, however remote, to be brought out for inspection not only by the opposing party but also for the benefit of the Court. . . . Thus, discovery should ordinarily be allowed under the concept of relevancy unless it is clear that the

---

[8] *Pearl City Elevator, Inc. v. Gieseke*, 2020 WL 5640268, at *2 (Del. Ch. Sept. 21, 2020) (alternation in original).

[9] Dkt. 309, Defs.' Mot. to Compel at 8.

[10] *In re Appraisal of Dole Food Co., Inc.*, 114 A.3d 541, 548 (Del. Ch. 2014) (quoting *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Stauffer Chem. Co.,* 1990 WL 177572, at *3 (Del. Super. Nov. 9, 1990)).

5

information sought can have no possible bearing upon the subject matter of the action.[11]

Two factors lead me to conclude that the Funding Agreement is relevant: the class action context in which this action arises and the express terms of the Funding Agreement itself.

### 1. The Class Action Context

First, the present matter arises from the class action context. Viewed in this context, class certification under Court of Chancery Rule 23 provides a clear connection between the pertinent legal issues in this action and the Funding Agreement.

Although it is ultimately "a matter of this Court's discretion[,]" when determining whether to certify a class, the "Court must undertake a 'rigorous analysis' . . . and 'make an explicit determination on the record of the propriety of the class action according to the requisites of Rule 23(a) and (b).'"[12] Among other things, this requires the Court to assess whether the named plaintiffs retained "competent and experienced counsel to act on behalf of the class."[13] Rule 23(d) also sets out an

---

[11] *Id.* (quoting *Boxer v. Husky Oil Co.,* 1981 WL 15479, at *2 (Del. Ch. Nov. 9, 1981)).

[12] *Buttonwood Tree Value P'rs., L.P. v. R. L. Polk & Co.*, 2022 WL 2255258, at *3 (Del. Ch. June 23, 2022) (footnote omitted) (discussing adequacy of class representative under Rule 23(a)(4)).

[13] *Id.* at *10 (quoting *In re Fuqua Indus., Inc. S'holder Litig.*, 752 A.2d 126, 127 (Del. Ch. 1999)).

independent requirement that "[c]lass counsel must fairly and adequately represent the interests of the class."[14]

If it is not already clear, this Court takes its thorough evaluation of the Rule 23 requirements seriously. Indeed, "[t]he adequacy of the class representative" requirement set out in Rule 23(a)(4) brings with it "a constitutional dimension. The Due Process Clause of the United States Constitution requires 'that the named plaintiff at all times adequately represent the interests of the absent class members.'"[15]

As it relates to these considerations, I believe there may be legitimate concerns that counsel could face a conflict of interest. There are many instances where a funder's interests might diverge from those of a claim holder.[16] But the class action context seems especially ripe for a third-party funder to exercise improper control over the litigation, at least relative to the heightened degree of oversight that might

[14] Ct. Ch. R. 23(d).

[15] *Prezant v. De Angelis*, 636 A.2d 915, 923 (Del. 1994) (quoting *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 812 (1985)); *see also* Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 12.02[b][5], at 12-16 to -17 (2022).

[16] J. Maria Glover, *Alternative Litigation Finance and the Limits of the Work-Product Doctrine*, 12 N.Y.U. J. L. & Bus. 911, 935 (2016) ("[O]ne could imagine any number of legitimate concerns about the ways in which litigation funding could alter the incentives of plaintiffs' counsel and potentially create conflicts between its loyalty to the class and its contractual obligations to the litigation funder."); Maya Steinitz, *Incorporating Legal Claims*, 90 Notre Dame L. Rev. 1155, 1168 (2015) ("[T]he introduction of a financier into the attorney-client relationship can produce conflicts or reinforce existing ones.").

7

tend to accompany an ordinary attorney-client relationship.[17] And "[t]his concern is even more problematic[,]" as here, where class counsel "contract[s] directly with a funder for financial resources" since, in doing so, counsel may take on duties to the funder that are separate and apart from counsel's "professional duties to the class."[18]

Given these clear concerns, it seems relevant to determine whether, or the extent to which, diverging interests may impact counsel's ability or willingness to adequately represent the class.

Such questions seem almost inherently to implicate the Funders' identities and the extent of their control (whether direct or indirect) over the litigation. These are questions the Funding Agreement can help answer.

Plaintiffs argue the Funders have no control over the litigation. They point to the previously redacted Funding Agreement Description in the Contingent Fee Agreements and suggest the language contained therein, by itself, is sufficient to assuage my concerns. But not all control takes an overt form that is set forth expressly in the terms of a contract. Indeed, "[f]unders . . . may engage in less obvious

---

[17] *See* Aaseesh P. Polavarapu, *Discovering Third-Party Funding in Class Actions: A Proposal for in Camera Review*, 165 U. Pa. L. Rev. Online 215, 222 (2017) [hereinafter "*Funding Class Actions*"] (Class counsel often is afforded wide latitude to "exercise[] nearly plenary control over all important decisions in the lawsuit . . . ." (quoting Jonathan R. Macey & Geoffrey P. Miller, *The Plaintiffs' Attorney's Role in Class Action and Derivative Litigation: Economic Analysis and Recommendations for Reform*, 58 U. Chi. L. Rev. 1, 3 (1991))); *see also In re Winchell's Donut Houses, L.P. Sec. Litig.*, 1988 WL 135503, at *2 (Del. Ch. Dec. 12, 1988) ("[T]here are aspects of a class action that[ ]from the 'client's' point of view-make that representation quite different. The class member cannot discharge his lawyer as can the typical 'client' and, in (b)(1) or (b)(2) actions, cannot opt out of the class action (which would accomplish the same result).").

[18] *Funding Class Actions* at 222.

forms of control."[19] The potential for funders to exercise discrete control over litigation might arise in a variety of ways that I need not delve into here.[20] Suffice it to say that the mere inclusion of these statements in the Contingent Fee Agreements, *to which the Funders themselves are not parties*, does little to relieve my concerns over their potential to exercise control over the litigation in a manner that may give rise to a conflict.[21]

---

[19] *Id.* at 221.

[20] *See id.* ("[R]epeated interactions between a funder and counsel may lead to a working relationship, and as a result, the funder may be able to exercise significant influence over counsel's decision[-]making. A funder may also threaten to withdraw financing unless the litigation proceeds according to its own strategic preferences." (footnotes omitted)); Steinitz, *supra*, at 1168 ("In addition to conflicts that are similar to those that exist between contingency fee lawyers and their clients—such as incentives to settle early in order to maximize profits across a portfolio rather than in a particular case, incentives to prioritize reputation over monetary relief, and incentives to prioritize monetary relief over nonmonetary relief—interesting examples of conflicts unique to the funder-client relationship include those that may arise if a funder decides to securitize its pool of litigations or to invest on both sides of the 'v.' Conflict concerns are often also concerns about control. Instead of overt control, like formal settlement authority or the right to dictate choice of counsel, conflicts can generate hidden forms of control. For example, any repeat-play relationship between funder and the litigation counsel gives funder informal but significant influence over the conduct of the case." (footnotes omitted)).

[21] To the contrary, the Funding Agreement Description in the Contingent Fee Agreements suggests other potential concerns. For example, based on the language used and the timing of signatures on the respective agreements, I have some questions as to whether the named Plaintiffs received or were aware of the terms of the Funding Agreement, either before or after the named Plaintiffs executed the Contingent Fee Agreements. *Compare* Log 6, Log 9, *and* White Aff. Exs. 8–10, *with* Log 52. My concerns are likely further colored, in part, by Judge Rakoff's decision denying class certification in *Gordon v. Sonar Cap. Mgmt. LLC*, 92 F. Supp. 3d 193 (S.D.N.Y. 2015), which addressed SHU's failure to disclose fee-arrangement information about which the Court had inquired. *Id.* at 199 (explaining SHU failed to "reveal[] the existence of a" fee-sharing arrangement with another attorney "at the hearing on appointment of lead plaintiff and lead counsel, even though the Court inquired into [SHU]'s separate fee sharing agreement with another 'referring counsel'").

### 2.     The "Expectation" Clause

The class action context might itself suggest the Funding Agreement is relevant to the matter at hand.  But that is not the only ground on which I base my determination of relevance.  The express terms of the Funding Agreement also set forth its parties' clear "expectation[s]" that it, or the arrangement set forth within, will be disclosed in some fashion during litigation.

In the final paragraph of what, in substance, is a six-paragraph agreement, the Funding Agreement expressly contemplates its own disclosure.  It provides: "It is our expectation that this arrangement will be disclosed to the court presiding over the Class Action at or before the time that the court is requested to certify a class in the case."[22]

I have difficulty thinking of a more direct acknowledgement of relevance than the Funding Agreement's parties stating their "expectation[s]" that the document or its terms will be disclosed during the course of litigation—at the class certification stage no less.[23]  It is as if they foresaw the potential concern over conflicts and tried to get ahead of the issue.  Here, and consistent with the broad treatment Delaware

---

[22] Log 52.

[23] I acknowledge there may be general concerns that requiring production of litigation funding agreements could have a chilling effect on funders' willingness to provide the resources needed to alleviate access-to-justice problems caused by the often-substantial cost of litigation.  *See, e.g., Funding Class Actions* at 230–31.  Here, that concern would seem misplaced.  The parties to the Funding Agreement expressly stated their expectation that the agreement or its terms would be disclosed in some fashion during litigation.  This is perhaps unsurprising since the Funders do not seem to be entities ordinarily involved in litigation funding.  Instead, they appear to be competitors financing litigation against a market peer.

courts afford determinations of relevance, I conclude the Funding Agreement is relevant.

Again, this conclusion is based in part on the nature of this action, the issues tending to arise in the class action context, and the admission of relevance set forth in the express terms of the Funding Agreement.[24]

## B.   Work Product

Plaintiffs assert the Funding Agreement is protected by the work product doctrine.  "The traditional work product doctrine has been codified in Chancery Court Rule 26(b)(3), and generally bars the discovery of materials created in anticipation of litigation or for trial preparation.  But this bar is not an 'impenetrable barrier.'"[25]

The burden to show withheld documents are privileged rests on the withholding party.[26]  Here, that burden falls to Plaintiffs.  Excluding two quotes,

---

[24] To the extent Plaintiffs suggest the Funders' identities are not relevant, I disagree. In addition to being plainly relevant for the reasons discussed above, I take note that some forums even have standing orders requiring that a party that has made funding arrangements with a third-party funder file a statement containing the "identity" of the funder, among other things.  *See* Standing Order Regarding Third-Party Litigation Funding Arrangements (D. Del. April 18, 2022), https://www.ded.uscourts.gov/sites/ded/files/Standing%20Order%20Regarding%20Third-Party%20Litigation%20Funding.pdf.  Still other courts have modified their local civil rules to require similarly.  *See* Amendment of Local Civil Rules (D.N.J. June 21, 2021), https://www.njd.uscourts.gov/sites/njd/files/Order7.1.1%28signed%29.pdf.

[25] *Saito v. McKesson HBOC, Inc.*, 2002 WL 31657622, at *3 (Del. Ch. Nov. 13, 2002) (footnote omitted).

[26] *Rembrandt Techs., L.P. v. Harris Corp.*, 2009 WL 402332, at *5 (Del. Super. Feb. 12, 2009) ("The party asserting a privilege bears the burden of establishing that documents or communications are, in fact, and as a matter of law, protected by privilege.  Therefore, a party who withholds 'information otherwise discoverable . . . by claiming that it is privileged or subject to protection as trial preparation material . . . shall make the claim expressly and

11

Plaintiffs dedicate a hardly exhaustive three sentences of their opposition brief to showing the Funding Agreement is protected work product.[27] The last of the three conclusory sentences also includes the full extent of Plaintiffs' argument as to the Contingent Fee Agreement. Plaintiffs' complete argument on privilege is set forth as follows:

> It is well established under Delaware law that litigation funding agreements and related documents are not discoverable. They are protected work product because they are prepared in anticipation of litigation and reflect litigation strategy. This Court addressed this issue in *Carlyle Investment Management, LLC v. Moonmouth Co. S.A.*, explaining: "Overall, it appears that the [litigation funding documents] were prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative. . . . The policies underlying the work product doctrine . . . favor a finding of protection."[] Similarly, in *Charge Injection Technologies, Inc. v. E.I. Dupont De Nemours & Co.*, the court held: "redacted payment terms in the Financing Agreement are entitled to work product protection . . . ."[] As such, Plaintiffs' redactions to their [Contingent Fee Agreements] to litigation funding are entirely appropriate, as is Plaintiffs' objection to the production of the [Funding Agreement].[28]

But contrary to Plaintiffs' assertion, *it is not* "well established" that, under Delaware law, "litigation funding agreements . . . are not discoverable." In fact, the courts in both *Carlyle* and *Charge Injection* had ordered production of redacted

---

shall describe the nature of the documents, communications, or things not produced or disclosed in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the applicability of the privilege or protection.'" (ellipses in original) (footnote omitted)).

[27] *See* Pls.' AB at 5–6.

[28] *Id.* (ellipses in original) (non-substantive footnotes omitted).

versions of the respective funding agreements—which the parties had produced.[29] So when rendering the decisions that Plaintiffs quote from, the courts were only ruling on whether the few remaining redactions were protected by the work product doctrine.[30] Consistent with these first two Delaware decisions on the issue, at least one other Delaware state court decision required production of a funding agreement with limited redactions when facing similar issues.[31] Still another has granted a motion to compel production of "withheld litigation funding communications," due to the plaintiff's failure to satisfy the burden to show the communications were entitled to work product protection.[32]

These decisions alone show that Plaintiffs do not meet their burden since Plaintiffs' argument turns entirely on its position that it is "well established" that funding agreements are not subject to discovery and thus the Funding Agreement

---

[29] *See Carlyle Inv. Mgmt., LLC v. Moonmouth Co. S.A.*, C.A. No. 7841-VCP, at 25–29 (Del. Ch. Oct. 20, 2014) (TRANSCRIPT); *Carlyle Inv. Mgmt. LLC v. Moonmouth Co. S.A.*, 2015 WL 778846, at *2 (Del. Ch. Feb. 24, 2015) (The defendants "submitted the required compliance statement[,]" according to which, the "[d]efendants produced: . . . a redacted copy of the [f]unding [a]greement with a redaction log . . . ."); *Charge Injection Techs., Inc. v. E.I. DuPont De Nemours & Co.*, 2015 WL 1540520, at *2–3 (Del. Super. Mar. 31, 2015) ("The Court ordered [the plaintiff] to produce the redacted version of the [f]inancing [a]greement and its privilege log" and the plaintiff "produced the redacted version" of the agreement.).

[30] Indeed, even the quotation Plaintiffs extract from *Charge Injection* makes it apparent that the court's decision was cabined only to address, at most, certain redacted terms of the already-produced funding agreement.

[31] *Elenza, Inc. v. Alcon Labratories Hldg. Corp.*, C.A. No. N14C-03-185-CCLD (Del. Super. June 14, 2016) (ORDER); *Elenza, Inc. v. Alcon Labratories Hldg. Corp.*, C.A. No. N14C-03-185-CCLD, at 111–13 (Del. Super. May 11, 2016) (TRANSCRIPT).

[32] *Cannon v. Romeo Sys., Inc.*, C.A. No. 2021-0171-PAF (Del. Ch. Apr. 10, 2023) (ORDER).

13

here is not discoverable.[33]  Further still, Plaintiffs make no mention of the "because of litigation" test that our courts tend to use in assessing the applicability of the work product doctrine.  But this was our courts' central focus in both *Carlyle* and *Charge Injection*.

Indeed, in what I believe to be this Court's most recent decision on the applicability of the work product doctrine to funding agreements, Vice Chancellor Laster—while recognizing the doctrine's applicability to diligence-related communications between party and funder—seems generally to have rejected the doctrine's applicability to the terms of a funding agreement.[34]  There, like here, the parties did not raise the "because of litigation" test in the briefing.

For the foregoing reasons, I grant the Motion as to the complete, unredacted Funding Agreement.[35]

---

[33] Even if it were true (which Plaintiffs do not show) that Delaware courts are generally averse to compelling production of funding agreements, Plaintiffs do not show why the Funding Agreement at issue here should receive the same or similar treatment that they assert our courts have afforded the others.  Only once in their entire argument do Plaintiffs actually refer to the Funding Agreement at issue in this action.  The other references are to "funding agreements" generally.

[34] *See In re Côte d'Azur Estate Corp.*, C.A. No. 2017-0290-JTL, at 57–61 (Del. Ch. Dec. 8, 2022) (TRANSCRIPT) ("I recognize that in *Carlyle*, Vice Chancellor Parsons stated that the terms of the final agreement, such as the financing premium or acceptable settlement conditions, could reflect an analysis of the merits of the case.  I agree with that at a high level; it could.  But I think it will rarely do so in a manner that actually implicates any type of privilege.").

[35] Separately, I note that, having conducted an *in camera* review of the Funding Agreement, its terms seem materially distinct from those that were at issue in *Carlyle* and *Charge Injection*.  Here, the Funding Agreement does not reflect any opinion work product, risk analyses, or other meaningful reference to strategy, mental impressions, or the lawsuit's merits.  I am confident that, in compelling production of the Funding Agreement, I am not

14

Plaintiffs' half-sentence argument for not producing fully unredacted Contingent Fee Agreements piggybacks entirely off their arguments as to the Funding Agreement.[36] And since Plaintiffs' argument rises and falls with the success of the Funding Agreement arguments, I also grant the Motion as to the complete, unredacted Contingent Fee Agreements.

## III. CONCLUSION

For the foregoing reasons, the Motion is granted as to the Funding Agreement and Contingent Fee Agreements. Plaintiffs shall deliver complete and fully unredacted copies of the Funding Agreement and the Contingent Fee Agreements to Defendants within seven days.

---

requiring Plaintiffs to disclose meaningful opinion work product. I am also confident the parties to the Funding Agreement did not believe they included confidential or privileged material in the document. This conclusion is reinforced by the parties' express anticipation that the Funding Agreement would be disclosed to the Court in connection with class certification.

[36] Pls.' AB at 5–6; *see also Grunstein v. Silva*, 2010 WL 1531618, at *2 (Del. Ch. Apr. 13, 2010) ("Communications regarding fee arrangements are typically discoverable because fee arrangements are considered incidental to the attorney-client relationship and do not usually involve the disclosure of confidential communications arising in the context of the professional relationship."); *Green v. ConAgra Poultry Co.*, 2007 WL 2319146, at *7 (Del. Super. July 11, 2007) (discussing Third Circuit precedent providing that, "[a]bsent unusual circumstances, the attorney-client privilege 'does not shield the fact of retention, the identity of clients, and fee arrangements'"), *aff'd*, 954 A.2d 909 (Del. 2008). The dependent nature of Plaintiffs' argument as to the Contingent Fee Agreements seems to follow logically from the fact that the redacted parts of those agreements do not meaningfully disclose anything the Funding Agreement does not already disclose.